IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERAMOSI OYATHELEMI          :

                                        :

    v.                           :   Civil Action No. DKC 20-3424

                                          :

L.J. ROSS ASSOCIATES         :

                                        :

**MEMORANDUM OPINION**

Pending and ready for resolution in this credit reporting and debt collection case is the motion for summary judgment filed by Defendant L.J. Ross Associates ("Ross").  (ECF No. 34).  The issues have been briefed, and the court now rules, no hearing being necessary.  Local Rule 105.6.  For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background**

Plaintiff Eramosi Oyathelemi owned and lived in a residence at 8111 River Park Rd., Bowie, MD 20715 ("the River Park Residence").  (ECF No. 34-12, at 8-9) (Eramosi Oyathelemi Deposition).  While the exact dates she lived there are unclear, she lived there from some point in 2013 to some point in 2015.  (*Id.* at 8).  During that time, the utility bills for the River Park Residence were in Ms. Oyathelemi's name.  (*Id.* at 9).  Ms. Oyathelemi obtained electric service for the River Park Residence

from Baltimore Gas and Electric ("BGE").[1]   (*Id.*).   Her account
number with BGE at that time was 6887639150 ("xx150 Account").
(*See, e.g.*, ECF No. 36-1, at 1).   At some point in late-2015 she
moved out of the River Park Residence.   (ECF No. 34-12, at 8).
She believes that she turned off BGE services at the River Park
Residence when she left it, but does not recall when exactly that
was and does not have any other evidence that she had the BGE
service turned off.   (ECF No. 34-12, at 15-16).   Her last BGE bill
in 2015 is dated November 13, 2015.   (ECF Nos. 36-1, at 1; 34-11,
at 17).

In 2016, Ms. Oyathelemi began residing at 1482 Carlyle Ct.,
Crofton, MD 21114 ("the Carlyle Residence").   She obtained
electricity service from BGE for the Carlyle Residence.   (ECF No.
34-12, at 9-10).   BGE provided her service again under account
number 6887639150.   Her first BGE bill in 2016 is dated April 27,
2016.[2]   (ECF Nos. 36-2, at 1; 34-8, at 5).

---

[1] Ms. Oyathelemi initially testified at her deposition that
BGE provided gas and electric service to the River Park Residence
while she lived there.   She later corrected herself that BGE only
provides electric service in Prince George's County, and
Washington Gas provides gas service.   (ECF No. 34-12, at 26).   A
BGE bill confirms that Ms. Oyathelemi was only charged for electric
service at the River Park Residence.   (ECF No. 36-1, at 1).

[2] Ms. Oyathelemi asserts that the November 13, 2015, bill was
marked "THIS IS YOUR FINAL BILL," which indicated that she had a
requested a termination of services at the River Park Residence.
(ECF No. 36, at 12) (citing 36-1, at 1).   Other BGE bills similarly
contained the language "THIS IS YOUR FINAL BILL."   (*See, e.g.*, 34-
6, at 8).   While the most reasonable way to read "THIS IS YOUR

After Ms. Oyathelemi moved out of the River Park Residence, she had a series of tenants at the residence.  One set of tenants was the Glover family.  (ECF No. 34-12, at 22).  They resided at the River Park Residence from sometime in 2015 until sometime in 2016.  At the same time, there was another tenant, named "Alicia," who lived in the basement.  (*Id.* 9-10).  Ms. Oyathelemi is not sure when Alicia moved out of the River Park Residence.  (*Id.* at 22).  At some point after Alicia moved out, however, a friend of Ms. Oyathelemi's, "Ashley," stayed at the house for, at most, a week or two.  (*Id.* at 23).  Ms. Oyathelemi testified at her deposition that the Glover family paid for its own utilities and that BGE utility bills were under the Glover name.  (*Id.*).  She further testified, however, that she did not have any evidence that BGE utility bills were in her tenants' names and not hers. (*Id.*).

Although unclear when, at some point Ms. Oyathelemi decided she was done with the "headache" of renting the River Park

---

FINAL BILL" is to read it as saying, "this bill is final and ready for payment," whatever dispute there is here is immaterial.  The xx150 account ledgers submitted by Ross state that a bill was issued on November 13, 2015, for $84.33, the same amount as the bill cited above by Ms. Oyathelemi.  (ECF No. 34-8, at 5).  The next bill incurred by the xx150 account was issued on April 27, 2016. (I*d*.).  Thus, the ledger aligns with Ms. Oyathelemi's timeline of stopping service on the xx150 account at the River Park Residence in late November 2015 (and restarting in 2016 at the Carlyle Residence).

Residence.[3]  (ECF No. 34-12, at 24).  She wanted to get the residence out of her name and "give the bank back their place[.]" (*Id.*).  Then, after an uncertain period of time, Ms. Oyathelemi discovered that squatters, perhaps as many as twelve, were residing in the River Park Residence.  (*Id.* at 13-14).  In 2019, Ms. Oyathelemi filed suit to evict the squatters from the River Park Residence and to obtain payment for bills that the squatters had accrued in Ms. Oyathelemi's name.  (*See id.*; ECF No. 36-3).  Ms. Oyathelemi testified that those bills were either for gas or water and sewage services at the River Park Residence.  (ECF No. 34-12, at 26-27).  Those bills did not, apparently, include an electricity bill.  Ms. Oyathelemi testified that she did not know how the squatters had obtained electric service at the River Park Residence, or even if the squatters had obtained electric service. (*Id.* at 28).  Ms. Oyathelemi did not sue the squatters for the BGE bills.  (*Id.*).  Moreover, Ms. Oyathelemi **did not** notify Ross or BGE about the squatters at the River Park Residence, at least not until after the start of this litigation.  (*Id.* at 15).  At her deposition, Ms. Oyathelemi refused to say whether one of the

---

[3] At her deposition, Ms. Oyathelemi was uncertain when she stopped owning the River Park Residence.  She testified that she attempted to conduct a "short sale" in 2016, and that because of delays related to the property's title, the squatters were able to move into the residence.  (ECF No. 34-12, at 12-14).  At another point in the deposition, she testified that she possibly stopped owning the River Park Residence as late as 2019.  (ECF No. 34-12, at 21).

squatters was the person who had accrued the charges at the River Park Residence after Ms. Oyathelemi moved out of it. (*Id.*).

**The Second BGE Account**

At some point in 2016, a BGE account with the account number 9852646730 ("xx730 Account") was opened in Ms. Oyathelemi's name. The xx730 Account was associated with the River Park Residence. The xx730 Account first incurred a bill on November 16, 2016. (ECF No. 34-8, at 2). The xx730 Account continued incurring bills until April 13, 2018. (*Id.*, at 1). During that roughly year and a half, some payments were made on the account. Neither party has presented evidence regarding who opened the xx730 Account or who was making the payments.

The last payment on the xx730 Account was made on September 11, 2017. (ECF No. 34-8, at 1). The balance of the xx730 Account then remained unpaid. In the May 29, 2018, bill, BGE merged or "transfer[ed]" the balance of the xx730 Account into the xx150 Account. (ECF No. 34-6, at 8). The bill states that there were "[o]ther charges and credits" of $2,339.03, (*Id.* at 6), which was a combination of "PRIOR ADDRESS TRANSFER CHARGES" from the xx730 Account associated with the River Park Residence, and $3.98 of late payment charges. (*Id.* at 8). The bill was addressed to Ms. Oyathelemi at the Carlyle Residence. (*Id.* at 6).

Ultimately, after the application of other charges and credits, the final amount that BGE asserted Ms. Oyathelemi owed

was $3,022.41.  (ECF No. 34-5, at 3).  Ms. Oyathelemi asserts without citation to the record that she told BGE she would not be paying the bill.  (ECF No. 36, at 14).

BGE referred the debt for collection to National Recovery Agency.  On January 7, 2019, National Recovery Agency mailed a debt collection letter to Ms. Oyathelemi.  (ECF No. 36-7, at 1).  Ms. Oyathelemi asserts without citation to the record that she called National Recovery Agency, complained about "obvious discrepancies regarding the bill," and demanded the debt collector provide full documentation regarding the debt.  (ECF No. 36, at 14).  She asserts without citation that National Recovery Agency ceased attempts to collect the BGE debt.

At some point after this, BGE sent the debt to Ross for collection.  On October 11, 2019, Ross mailed a collection letter to Ms. Oyathelemi for $3,022.41.  (ECF No. 34-3, at 3).  Ms. Oyathelemi did not contact anyone—BGE, Ross, or a consumer reporting agency ("CRA")—to dispute the debt.  Ms. Oyathelemi does not remember ever receiving this letter.

Nearly a year later, Ross mailed a second collection letter to Ms. Oyathelemi on August 10, 2020, for the same BGE debt of $3,022.41.  (ECF No. 34-4, at 1).  Ms. Oyathelemi did dispute this letter.  She contacted Ross directly, (ECF No. 34-12, at 55), and various CRAs, (ECF Nos. 34-9, at 1; 35, at 2; 39-12, at 1).  It is

not clear how much detail Ms. Oyathelemi included in her dispute
of the BGE debt.

It is disputed whether Ms. Oyathelemi contacted BGE to dispute
the bill.  While BGE's agent attests that BGE has no record of Ms.
Oyathelemi ever questioning or protesting the bills, (ECF No. 34-
11, at ¶11), Ms. Oyathelemi testified at deposition that she did
contact BGE, (ECF No. 34-12, at 44-45, 50).[4]  Her deposition
testimony appears to state that she told BGE that the bill was
inaccurate, but it is not clear because her testimony is cut off
by a "reporter interruption" and then the deposition went off the
record.  (*Id.* at 50).  Moreover, as explained below, Ms. Oyathelemi
stated in emails to Ross in the fall of 2020 that she had obtained
copies of disputed bills from BGE.  (ECF Nos. 36-8; 36-9).

---

[4] When this contact with BGE occurred, and what she told BGE
when she contacted it, is unclear.  Her testimony about her contact
with BGE is vague.  (ECF No. 34-12, at 49-50).  It is not clear if
she is referring to contact with BGE when they initially
transferred the balance of the xx730 Account into the xx150
Account, when National Recovery Agency contacted her, or when Ross
contacted her.  When asked about her efforts to contact BGE during
her deposition she ultimately admitted that she does not remember
the timeline: "I can't tell you what happened first, second, third,
fourth, fifth, six with this issue.  All I can tell you is I
contacted proper authorities and said this was not my bill.  I
didn't make this bill.  I contacted you.  I contacted BGE.  The
time line of it, I don't know." (ECF No. 34-12, 50-51).

**Ross's Investigation**

What happened next, like most of the events in this case, is slightly unclear.  After Ms. Oyathelemi disputed the BGE debt with Ross,[5] Ross conducted an investigation.

A Ross compliance specialist, Nichole Clemons, attests in an affidavit that she contacted BGE, communicated with a BGE agent, Donald Dove, and obtained copies of Ms. Oyathelemi's past bills. (ECF No. 34-10, at ¶11).  This investigation confirmed that BGE had two accounts, the xx150 and xx730 Accounts, assigned to Ms. Oyathelemi.  One of the accounts was assigned to the River Park Residence and the other account was assigned to the Carlyle Residence:

(1)   Account Number 9852646730: 8111 River Park Rd., Bowie, MD 20715

(2)   Account Number 6887649150: 1482 Carlyle Ct., Crofton, MD 21114

(ECF No. 34-10, at ¶12).  A BGE account summary confirms that both accounts are in Ms. Oyathelemi's name.  (ECF No. 34-7).  Ross's investigation confirmed that BGE had merged the outstanding balance on the xx730 Account, $2,335.05, into the xx150 Account.

On August 20, 2020, Ross sent Ms. Oyathelemi a letter to which it attached a copy of the July 17, 2018, bill.  (ECF No. 34-5, at 3).  Because Ross only attached a copy of the July 17, 2018, bill

---

[5] It is not clear how Ms. Oyathelemi contacted Ross to dispute the debt—whether by phone, letter, or email.

and sent this response to Ms. Oyathelemi within ten days of its debt collection letter, it is not clear if the entirety of the investigation outlined by Ms. Clemons above occurred within those ten days.

In any event, Ms. Oyathelemi remained unsatisfied with Ross's efforts. She took two series of actions. First, at some point in September, Ms. Oyathelemi wrote a letter disputing the debt. She sent the letter to "all credit bureaus." (ECF 36-12). She submitted a copy of the letter she sent to Equifax into the summary judgment record. She makes the same complaints in that letter that she made elsewhere: that Ross was reporting the BGE debt; that Ross had not sufficiently proved to her that the charges were incurred by her; and that Ross had refused to provide sufficient details about the xx730 Account. She states that she attached all proof to the letter that supported her claim of inaccurate and fraudulent reporting, but nothing is attached to the letter which was submitted as an exhibit for summary judgment. At her deposition, she could not remember if she had attached evidence to the letter. (ECF No. 34-12, at 55).

Second, after Ms. Oyathelemi received the August 20, 2020, letter from Ross, she communicated with Ross by phone and email. The parties have submitted only some of these communications into the summary judgment record. For example, Ms. Oyathelemi asserts that she has recordings of her phone calls with Ross's agents, and

that she obtained recordings of six phone calls from Ross during discovery, but none of these calls have been entered into the record.   Two emails, however, were entered into the summary judgment record.

The first email was sent by Ms. Oyathelemi on September 23, 2020.  (ECF No. 36-8).  She stated that it was her "final attempt" to have Ross remove the "erroneous reporting."   She complained that Ross was certifying the debt without proof, despite her requests for proof that she owed the debt.   She then complained that Ross agents had inaccurately asserted that she had not made any payments on the xx150 Account between February 2016 and July 2018, and that she had been called a liar when she said that the utilities could not have stayed on for that long if she had not paid the bills.  She attached images of three documents, which she said she had obtained from BGE.  The images appear to be pictures of a BGE bill, but they are impossible to read.  She said the attachments were the proof she had requested from Ross, and that the images showed that (1) she had made payments to BGE; (2) her account was up to date; and (3) owing $3,022.41 was "nearly impossible."  She did not include full sized copies of the images as part of ECF No. 36-8.  It is not clear if they are images of one of the bills provided separately by the parties.

On October 1, 2020, Ms. Oyathelemi sent a second email.  (ECF No. 36-9).  She began by saying that she wrote the attached letter

with proof that Ross was in violation of the "FDCRA."[6]  She said

that she had not heard back from anyone, apparently in response to

her September 23 email.  She stated that for several months she

had asked for an "accounting" of what Ross asserted she owed BGE,

but had not received one.  She said that the most infuriating part

of this process had occurred in July, when she spoke with "Mike."[7]

She said that he had accused her of never paying her bills for the

entirety of the contract period with BGE.  Moreover, she

complained, Mike basically called her a liar and asked "do you

understand" in a tone that upset her.  She said that she had

obtained an "actual tabulation" from BGE, and that there were

"clear discrepancies" between Ross's records and the paper records

sent to her by BGE.  She asserted that she believed Ross was in

---

[6] This appears to be a combination of the acronyms of the Fair Credit Reporting Act, FCRA, and the Fair Debt Collection Practices Act, FDCPA.

[7] It is not clear how or why Ms. Oyathelemi would have spoken with "Mike" about the debt in July of 2020, given that elsewhere she has stated that she was not aware of the collection effort by Ross until she received Ross's August 20, 2020, letter.  This is not the only instance of the timeline not quite adding up.  Ms. Oyathelemi submitted a letter into the record that she received from Experian.  The letter reports "Dispute Results" and states that the Ross account would remain because Ross had certified that the information was accurate.  The letter states that it is a report "for 08/06/20."  (ECF No. 35, at 2).  It is not clear if this means it was issued on August 6, or had a different reason for referencing that date.  Neither party discusses these apparent inconsistencies in the timeline.  The most likely answer for these inconsistencies is that they are further instances of Ms. Oyathelemi's uncertainty over the exact chronology of the events related to this litigation.

violation of Maryland law and the FDCPA, both because of the way "Mike" had spoken to her, and because Ross continued to verify the debt against her despite her having proof that it was inaccurate. She attached to the email the same three images that she had attached to the September 23, 2020, email. The images are again illegible.

The very next day, Ross mailed Ms. Oyathelemi a letter reiterating that its investigation had verified the debt against her. This time, Ross attached copies of BGE bills from April 13, 2018 (xx730 Account); April 27, 2018 (xx150 Account); May 29, 2018 (xx150 Account); June 28, 2018 (xx150 Account); and July 17, 2018 (xx150 Account). (ECF No. 34-6, at 1-12). Although not certain, it seems that this was a more extensive set of bills than Ms. Oyathelemi possessed, or at least was a more extensive set than she had attached to her emails to Ross. Ms. Oyathelemi received this letter from Ross. (ECF No. 34-12, at 42-43).

Ms. Oyathelemi has repeatedly asserted that the charges from the xx730 Account were not incurred by her. (*See e.g.*, ECF No. 34-12, at 16-17). At her deposition, however, Ms. Oyathelemi conceded that she had no evidence that the bills had not been incurred by her. (ECF No. 34-12, at 16-18).

**Procedural History**

Ms. Oyathelemi filed a complaint against Ross in the District Court of Maryland for Anne Arundel County on October 26, 2020.

(ECF No. 3).  On November 24, 2020, Ross removed the case to this court.  A few weeks later Ross answered the complaint.  (ECF No. 7).  The parties conducted discovery.  Afterwards, Ross moved for summary judgment.  (ECF No. 34).

Ms. Oyathelemi's initial Maryland District Court complaint was filed without the help of counsel.  She obtained counsel and he entered his appearance in February 2021.  (ECF No. 11).  She never filed an amended complaint.  That presents some challenges, because her Maryland District Court complaint contains no citations to any statutes or law under which her claims are brought.  Although Ms. Oyathelemi apparently identified certain statutory provisions during discovery under which she was suing, (*see, e.g.*, ECF No. 36, at 23) (citing her own responses to Defendant's Request for Production of Documents), she did not fully identify the provisions under which she sues in a filing before this court until her opposition.

## II.  Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  See *Liberty Lobby*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.

*See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

The parties have proceeded under the assumption that Ms. Oyathelemi asserts claims under the Fair Credit Reporting Act ("FCRA"); Fair Debt Collection Practices Act ("FDCPA"); and multiple state law statutes.  Ross asserts that it is entitled to summary judgment on all of Ms. Oyathelemi's claims.

### A.   FCRA Claim

> "Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 147 (4th Cir.2008) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007)).  The FCRA creates a private right of action allowing injured consumers to recover "any actual damages" caused by negligent violations and both actual and punitive damages for willful noncompliance.  See *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 239 (4th Cir.2009); see also 15 U.S.C. §§ 1681n, 1681o.

*Akpan v. First Premier Bank*, No. 09-cv-1120-DKC, 2010 WL 917886, at *2 (D.Md. Mar. 8, 2010).

Ms. Oyathelemi asserts her claims are brought under two provisions of the FCRA: 15 U.S.C. § 1681e(b) and 15 U.S.C. § 1681o. (ECF No. 36, at 21).  Section 1681e(b) requires CRAs to follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report

relates." Ross asserts that Ms. Oyathelemi cannot bring a § 1681e(b) claim against it, because Ross is a furnisher not a CRA. (ECF No. 38, at 3). Section 1681e(b) expressly applies to CRAs, and not to furnishers. Other courts have rejected attempts by plaintiffs to bring § 1681e(b) claims against furnishers. *See, e.g.*, *Croft v. Bayview Loan Servicing, LLC*, 176 F.Supp.3d 582, 587–88 (D.S.C. 2016).

Section 1681o creates a private cause of action for negligent failure to comply with a provision of the FCRA. Ms. Oyathelemi does not identify an underlying FCRA provision. She only asserts that her § 1681o claim is asserting "negligent noncompliance with the reporting to credit bureaus." (ECF No. 36, at 21). Ross suggests that Ms. Oyathelemi may be seeking to bring a negligence claim premised on § 1681s-2. (ECF No. 38, at 3). As relevant here, § 1681s-2 imposes duties on "furnishers of information" to CRAs. "Under § 1681s-2(a), [the] FCRA prohibits any person from furnishing information to a [consumer reporting agency] that the person knows is inaccurate." *Saunders*, 526 F.3d at 148. Where a consumer disputes the accuracy of information that the furnisher has reported, the FCRA requires the CRA to notify the furnisher of the dispute, § 1681i(a)(2), and upon receipt of this notice, the furnisher must (1) "conduct an investigation with respect to the disputed information," (2) "review all relevant information provided by the consumer reporting agency," (3) "report the results

16

of the investigation to the consumer reporting agency," and (4) "if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis." 15 U.S.C. § 1681s-2(b)(1).  The FCRA "explicitly bars suits for violations of § 1681-2(a), but consumers can still bring private suits for violations of § 1681s-2(b)." *Saunders*, 526 F.3d at 149 (citing § 1681s-2(c)).

Ms. Oyathelemi's citation to § 1681e(b) and the factual arguments she makes in support of her FCRA claim support the conclusion that she seeks to bring claims of negligent compliance with § 1681s-2.  First, "the same standard of accuracy" applies to a CRA's obligations under § 1681e(b) and a furnisher's under § 1681s-2.  *Saunders*, 526 F.3d at 148 n.3.  The provisions "serve the same purpose: ensuring accuracy in consumer credit reporting." *Id.*  Second, her three arguments indicate she clearly is challenging the way in which Ross complied with its duties under § 1681s-2.

First, Ms. Oyathelemi argues that Ross did not investigate or explain how she simultaneously accrued charges on the two different BGE accounts.  (ECF No. 36, at 21).

Second, she argues that inaccuracies in the affidavit of Ross's compliance specialist bring into question the credibility

and diligence of the compliance specialist.  (ECF No. 36, at 21-22).  In support, she points to the assertion in the affidavit submitted by the compliance specialist that BGE had sent all of Ms. Oyathelemi's bills for both the 730 and 150 Accounts to her at the Carlyle Court Residence.  Ms. Oyathelemi says this is inaccurate, because (1) the bill for the River Park Residence is addressed to the non-existent town of "Croft, Md."; and (2) Ms. Oyathelemi asserts that she never received a bill for the xx730 Account.  (ECF No. 36, at 21).  Ms. Oyathelemi does not provide any citation to the record for this allegedly misaddressed bill.

Third, she argues that the May 29, 2018, bill for the xx150 Account has an incorrect "previous balance" of $676.15.  (ECF No. 36, at 22).  She asserts that the prior month's bill for the xx150 Account had assessed a "total amount due" of $256.36.  Thus, her payment of $270 should have resulted in an "outstanding balance" of -$13.64, not $406.15.  (ECF No. 36, at 22).

Based on this, Ms. Oyathelemi's FCRA claim is assessed under two theories: (1) a failure to comply with § 1681s-2(b)(1)(A)'s investigation requirement; and (2) a report of inaccurate information in violation of § 16812-2(b)(1)(C).  For a plaintiff to succeed on a § 1681s-2(b)(1)(A) failure to investigate reasonably claim she must show that (1) she notified a CRA of the disputed information; (2) the CRA notified the defendant furnisher of the dispute; and (3) the furnisher then failed to investigate

18

reasonably and modify the inaccurate information.[8]   *Long v. Pendrick Capital Partners II, LLC*, 374 F.Supp.3d 515, 527 (D.Md. 2019) (citing *Johnson v. MBNA Am Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004)).   For a plaintiff to succeed on a § 1681s-2(b)(1)(C) inaccurate information claim she must show that the defendant furnisher reported incorrect information or omitted details that rendered the reported information misleading.   *Id.*

### 1. Reasonable Investigation

"[Section] 1681s-2(b)(1)(A) requires [furnishers], after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson*, 357 F.3d at 431.  "The burden of showing the investigation was unreasonable is on the plaintiff.  *See Gorman,* 584 F.3d at 1157; *Westra,* 409 F.3d at 827; *Johnson,* 357 F.3d at 429-31." *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010). Whether a defendant's investigation is reasonable is a factual question normally reserved for trial, but summary judgment is proper if the reasonableness of the defendant's procedures is beyond question and if the plaintiff has failed to adduce evidence

---

[8] A claim for failure to investigate reasonably requires showing not just that the investigation was unreasonable, but also that the information reported was inaccurate.  *Alston v. Equifax Information Services, LLC*, No. 15-cv-3343-TDC, 2016 WL 5349716 at *2 (D.Md. Sept. 22, 2016) (collecting cases from the First, Fourth, Ninth, and Eleventh Circuits).

that would tend to prove that the investigation was unreasonable. *See, e.g., Jainqing Wu v. Trans Union*, No. 03-cv-1290-AW, 2006 WL 4729755, at *8 (D.Md. May 2, 2006); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). "[T]he cost of verifying disputed information" should be weighed against "the possible harm to the consumer." *See Johnson*, 357 F.3d at 432-33.

Under Section 1681s-2(b)(1), a furnisher is only required to investigate information it has provided if a CRA notifies it that a consumer has contacted the CRA and disputed the furnished information. *Mavilla v. Absolute Collection Service, Inc.*, 539 Fed.Appx. 202, 208 (4th Cir. 2013) (citing *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 784 (W.D.Ky. 2003) ("This means that a furnisher of credit information . . . has no responsibility to investigate a credit dispute until after it receives notice from a consumer reporting agency.") (emphasis in original)).

Whether a furnisher's investigation was reasonable is determined based on the information the furnisher received from a CRA. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) ("The pertinent question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."). "[T]he Fourth Circuit has held that the nature and specificity of the information provided by consumer reporting agencies to the furnisher may affect the scope of the

20

investigation required of the furnisher." *United Collections Bureau, Inc.*, 2014 WL 859013 at *8 (citing *Johnson*, 357 F.3d at 431).

> Indeed, the court in *Chiang v. Verizon New England Inc.*, 595 F.3d at 38, reasoned that "**a more limited investigation may be appropriate when [consumer reporting agencies] provide the furnisher with vague or cursory information about a consumer's dispute.** The statute is clear that the investigation is directed to the information provided by the [consumer reporting agency]."

*Id.* (emphasis added).

The parties in this case spend almost no time discussing what notice the CRAs provided to Ross of Ms. Oyathelemi's dispute. In fact, it seems as though Ross investigated Ms. Oyathelemi's dispute without waiting for a notice of a dispute from a CRA. Ross, however, has not asserted it is entitled to summary judgment on the theory that it never received notice of a dispute from a CRA. Nor has Ross argued its investigation was reasonable in light of information it received from a CRA. Instead, Ross seems to argue that the fact that it investigated at all, and that there is no dispute that its investigation confirmed that Ms. Oyathelemi owed the BGE debt, means it is entitled to summary judgment. (ECF No. 38, at 4-5). Ms. Oyathelemi raises objections to Ross's investigation without addressing the above law. (ECF No. 36, at 22). The burden is on Ms. Oyathelemi, as the Plaintiff and nonmovant on a motion for summary judgment, to establish that Ross

21

did not conduct a reasonable investigation and to confront Ross's facts with facts of her own in the summary judgment record. Despite these burdens, Ms. Oyathelemi has failed to introduce evidence of the notice Ross received from any CRA.

In light of the parties' failure develop the record, the reasonableness of Ross's investigation will be evaluated based on the information Ross received from Ms. Oyathelemi.[9] *Cf. Gray v. Amsher Collection Services, Inc.*, No. 18-cv-0872-PX, 2019 WL 2142492 at *3-4 (D.Md. May 15, 2019) (denying summary judgment where consumer directly notified furnisher of mismatched addresses

---

[9] Moreover, it seems that Ms. Oyathelemi provided the same degree of specificity to the CRAs that she provided to Ross. The record contains one of the letters that Ms. Oyathelemi sent to "all Credit Bureaus in September [2020.]" (ECF No. 36-12). It states in relevant part:

> [Ross] is fraudulently reporting an account and refuses to prove that I owe the account and also refuses to remove it. I ask[ed] them to validate that the account and the charges were mine and I owed what they said I owed. They responded that the "bulk of the charge is from an outside account" and refused to provide me details on that outside account. I am not aware of any outstanding debt I owe to BGE; [furthermore] it is impossible for me to have incurred $3022 of electricity bill in the townhouse I lived in.

(ECF No. 36-12). The assertions Ms. Oyathelemi made to Ross in disputing the BGE debt are similar: that she was disputing the accuracy of the BGE debt and whether she owed it. (ECF Nos. 36-8; 36-9). She did not explain what the inaccuracies were, just that they existed. She also complained of Ross's failure to provide her with evidence or an accounting of the BGE debt. (*Id.*). Nothing in the record suggests that a CRA would have provided any more detail than the above to Ross.

and an unfamiliar authorized user name on account, and furnisher
only confirmed existence of debt with creditor, with no evidence
indicating that furnisher investigated allegations of fraud).

Reading the evidence in the light most favorable to Ms.
Oyathelemi, Ms. Oyathelemi provided Ross with general assertions
that she did not owe the debt, that the debt was wrong, and that
the bulk of the debt came from an "outside account."   It is
undisputed that Ms. Oyathelemi did not inform Ross of the squatters
that had resided in the River Park Residence and incurred utility
charges in Ms. Oyathelemi's name.

Based on that information, Ross investigated the BGE debt.
That investigation included contacting BGE and obtaining billing
and account data for the two accounts on which electricity charges
had accrued.   That evidence demonstrated that both the XX150 and
XX730 accounts were in Ms. Oyathelemi's name and had accrued
electricity service charges.

As explained above, Ms. Oyathelemi makes three arguments in
support of her FCRA claims.   Her arguments do not differentiate
between the theories of unreasonable investigation and inaccurate
information, but instead are generalized complaints about Ross's
conduct.   First, she argues that Ross did not investigate or
explain the "overlapping timeline of bills on both accounts." (ECF
No. 36, at 21).   The undisputed evidence is that Ross investigated
and confirmed that both accounts were in Ms. Oyathelemi's name.

23

Ms. Oyathelemi may have wished for Ross to investigate whether the squatters incurred the xx730 Account bills, but Ross had no reason to know about the squatters.  Second, Ms. Oyathelemi asserts that the credibility of the Ross employee who conducted the investigation is questionable, because the employee attested that BGE sent all the bills for both accounts to the Carlyle Residence, when in fact one of the bills was addressed to the non-existent town of "Croft, Md." and the other bill was addressed to her P.O. Box in Crofton, Maryland.  (ECF No. 36, at 21-22).  Ms. Oyathelemi does not provide citations to the record to support her arguments, and the bill addressed to "Croft, Md." has not been found in the record.  In any event, this does not appear to be an attack on the reasonableness of the investigation in response to Ms. Oyathelemi's dispute, but instead an attack on the accuracy of its results.  To the extent that it is an attack on reasonableness, the "FCRA does not require perfection, only a reasonable response." *Alston*, 2014 WL 859013, at *8 (quoting *Beachley v. PNC Bank, Nat. Ass'n*, No. 10-cv-1774-JKB, 2011 WL 3705239, at *3 (D.Md. Aug. 22, 2011)).  Even accepting these allegations of inaccuracy, the overall scope of the investigation was reasonable.  Her third argument asserts that one of the bills was miscalculated.  This time she provides specific numbers and calculations in support of her position.  (ECF No. 36, at 22).  As already explained, the summary judgment record indicates that she did not provide Ross

with this level of detail in disputing the BGE debt.  Instead, she
only made vague allegations of "discrepancies."  (*See* ECF No. 36-
9).  The communications did not indicate the underlying reason why
the charges on the xx730 Account were possibly not incurred by
her, nor did they even articulate what the perceived inaccuracies
on the bills were.  Thus, the communications did not require Ross
to conduct a more "searching inquiry."  *Chiang*, 595 F.3d at 40
("None of these reports alerted CBCS to which of the allegedly
erroneous charges underlying Chiang's dispute was inaccurate.  Nor
did they evidence that a more searching inquiry may have been
necessary.").   Thus,  there  is  no  genuine  dispute  that  the
investigation conducted by Ross was not unreasonable.  *See id.*
("The fact that Chiang put on evidence that he told Verizon NE he
disputed various bills does not itself raise a reasonable inference
that  Verizon,  through  CBCS,  conducted  an  unreasonable
investigation . . . ").

## 2. Inaccurate Information

Ms. Oyathelemi's arguments for why there is a genuine dispute
about Ross reporting accurate information can be distilled to two
assertions: (1) Ross reporting that she owed the entirety of the
BGE debt was inaccurate because she did not owe any of the xx730
Account portion of the debt; and (2) Ross reporting that she owed
the entirety of the BGE debt was inaccurate because she was

assessed an errant $419.79 on her May 29, 2018, bill.  (ECF No. 36, at 22).

Ms. Oyathelemi has not generated a genuine dispute about the first assertion.  The undisputed evidence is that BGE had two accounts, both in her name, which accrued bills for electricity services.  Ms. Oyathelemi asserts that "material issues still exist ripe for trial such as who actually opened account 730, when account 730 was opened, where the plaintiff truly resided at the time account 730 was opened and closed, and whether account 730 was opened by one of the dozen or so squatters[.]"  (ECF No. 36, at 5).  Those issues may have been ripe for trial had Ms. Oyathelemi generated any evidence on them.  She did not, however, use discovery to develop such evidence.  She points to no evidence in the record which could answer the above questions.  In fact, Ms. Oyathelemi foreclosed one theory of "who" opened the xx730 Account when she expressly testified at her deposition that she was not accusing the squatters of being the ones who ran up the xx730 Account bills.  Instead, she repeats her refrain that Ross failed to prove she owed the debt.  (*Id.* at 22).  As already explained, Ms. Oyathelemi has the burden of generating a dispute about the inaccuracy of information.  She has not done so on this theory.

Ms. Oyathelemi's second argument relates to the bill in which the xx730 Account's balance was merged into the xx150 Account.  In April 2018 her bill for the xx150 Account was $256.36.  (ECF No.

34-6, at 4).  She made a payment to BGE of $270.00.  (ECF No. 34-6, at 6).  The May 2018 bill would reasonably be expected to show an outstanding balance of $256.36, a payment of $270.00, and an account credit of -$13.64.  Instead, the May 2018 bill shows an outstanding balance of $676.15, which is $419.79 higher than the April 2018 bill.  Thanks to Ms. Oyathelemi's overpayment, the outstanding balance was $406.15, to which was added that month's electric charges, other charges and credits, and the total of the xx730 Account balance.[10]

While Ms. Oyathelemi's confusion about where this $419.79 came from is understandable, (*see, e.g.*, ECF No. 36, at 22), it was her burden to generate evidence that this amount was, in fact, inaccurate.  She did not use the tools of discovery to obtain an explanation from BGE.  Her argument is merely that she does not know where the amount came from.  This is insufficient to generate a genuine dispute of fact about the accuracy of the amount when, as here, Ross has provided copies of ledgers for the xx730 Account, (ECF No. 34-8, at 1-2), and the xx150 Account, (ECF No. 34-8, at 3-7).  The ledger for the xx150 Account shows that in the months preceding the May 2018 bill, bills often went either unpaid or were only paid in part.  (*See* ECF No. 34-8, at 3).  The best

_____

[10] The total bill for the May 2018 bill was $2,909.90.  (ECF No. 34-6, at 6).  It would take several more months of bills, fees, and credits before BGE arrived at the amount which remains in dispute, $3,022.41.

reading of this undisputed evidence is that the $419.79 came from
the overdue balance on the xx150 Account.  Ms. Oyathelemi has not
generated evidence disputing this.  Thus, there is no dispute that
Ross reported accurate information to the CRAs about the BGE debt
owed by Ms. Oyathelemi.[11]  Summary judgment will be entered on Ms.
Oyathelemi's FCRA claims.

> **B.    FDCPA Claim**
>
> The FDCPA seeks "to eliminate abusive debt
> collection practices by debt collectors." 15
> U.S.C. § 1692(e).   The Act "is a strict
> liability statute and a consumer only has to
> prove one violation to trigger liability."
> *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336
> F.Supp.2d 492, 500 (D.Md. 2004).  To succeed
> on a FDCPA claim, a plaintiff must demonstrate
> that "(1) the plaintiff has been the object of
> collection activity arising from consumer
> debt, (2) the defendant is a debt collector as

---

[11] Ms. Oyathelemi complains elsewhere in her memorandum that
Ross "continued to verify the debt as accurate, preventing the
credit bureaus from []removing it from the Plaintiff's account."
(ECF No. 36, at 16).  She bases her argument on a May 2021 Experian
credit report which she says reports the debt but fails to state
that she is disputing it.  That report does not appear to be a
part of the summary judgment record.  "[A] furnisher does not
report incomplete or inaccurate information within the meaning of
§ 1681s-2(b) simply by failing to report a meritless dispute,
because reporting an actual debt without noting that it is disputed
is unlikely to be materially misleading." *Carrasco v. M&T Bank*,
21-cv-532-SAG, 2021 WL 4846844 at *4 (D.Md. Oct. 18, 2021) (cleaned
up).  The undisputed evidence is that, after Ms. Oyathelemi's vague
disputes, Ross investigated and verified that the BGE debt had
been incurred by accounts in Ms. Oyathelemi's name.  Based on that
evidence, her dispute was meritless.  Ross was not required to
report the account as disputed.  Moreover, Ms. Oyathelemi has not
generated a dispute about what Ross reported to the CRAs, or what
it was reporting by May 2021.  She has entered nothing into the
summary judgment record concerning the reports she alleges Ross
was making.

> defined by the FDCPA, and (3) the defendant
> has engaged in an act or omission prohibited
> by the FDCPA." Stewart v. Bierman, 859
> F.Supp.2d 754, 759-60 (D.Md. 2012) (internal
> citations omitted).

*Long v. Pendrick Cap. Partners II, LLC*, 374 F.Supp.3d 515, 531–32 (D.Md. 2019). The evidence establishes conclusively that Ms. Oyathelemi is a consumer and that Ross is a debt collector.

Similar to her FCRA claims, Ms. Oyathelemi waited until her opposition memorandum to unveil all the provisions of the Fair Debt Collection Practices Act under which she is suing. She asserts that her claims are brought under:

(1) 15 U.S.C. § 1692b;

(2) 15 U.S.C. § 1692c;

(3) 15 U.S.C. § 1692d;

(4) 15 U.S.C. § 1692e;

(5) 15 U.S.C. § 1692f;

(6) 15 U.S.C. § 1692g; and

(7) 15 U.S.C. § 1692j.

(ECF No. 36, at 23).

The "facts" which Ms. Oyathelemi cites in support of these provisions are confusing and consist almost entirely of the quotation of one of her answers to Defendant's Request for Production of Documents, which gestures to other facts throughout

the summary judgment record.[12]  She asserts that there are seven factual bases for her FDCPA claims: (1) Ross "harass[ed] and belittl[ed]" her on the phone in violation of § 1692f; (2) Ross failed to provide a ledger of BGE bills at her request; (3) Ross communicated credit information it knew or should have known was false, including that the BGE debt was disputed, in violation of § 1692e(8); (4) Ross did not provide copies of past bills showing "proof of conflicting dates the defendant certified to the credit bureaus"; (5) Ross incorrectly told her that she had not paid a bill on the xx150 Account since February 2016 in violation of § 1692e; (6) Ross did not review "[Ms. Oyathelemi's] records before certifying the debt to the Credit Bureaus, but were relying on the word of BGE and a single bill showing BGE merged accounts" in violation of § 1692e; and (7) Ross continues to report the BGE debt to CRAs with no indication the debt is disputed in violation of §1692e(8).  (ECF No. 36, at 23-24).

---

[12] In fact, both parties have failed in their obligations to assist the court in resolving this motion. Ms. Oyathelemi largely fails to connect her factual allegations to provisions of the FDCPA and cites next to no authority.  (ECF No. 36, at 23-24).  Ross does little more.  It identifies basic FDCPA standards, (ECF No. 34, at 19-20), incorrectly states that a discovery response is not evidence at summary judgment, (ECF No. 38, at 5), and makes almost no effort to interact with the facts or FDCPA provisions pointed to by Ms. Oyathelemi, (*Id.* at 5-6).  *See, e.g.*, Fed.R.Civ.P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record, including . . . **interrogatory answers, or other materials**[.]") (emphasis added).

**1. Sections 1692b, 1692c, and 1692j**

Three provisions appear to be unrelated to Ms. Oyathelemi's factual allegations: §§ 1692b, 1692c, and 1692j.  Section 1692b sets requirements for a "debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer[.]"  There is no genuine dispute that this provision is unrelated.

Section 1692c governs communications by a debt collector with a consumer.  The provision prohibits a debt collector from communicating with a consumer in connection with collection of a debt in several ways: (1) "at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer[,]" § 1692c(a)(1); (2) "if the debt collector knows the consumer is represented by an attorney with respect to such debt[,]" § 1692c(a)(2); (3) "at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication[,]" § 1692c(a)(3).  Section 1692c(b) restricts who a debt collector may communicate with unless the debt collector first obtains consent from the consumer or from a court.  A debt collector does not need consent to communicate with the creditor.  § 1692c(b).  Section 1692c(c) governs when a debt collector must cease communicating with a consumer.  Ms. Oyathelemi has not

31

identified facts that generate a genuine dispute of Ross violating any of § 1692c's provisions.

Section 1692j(a) states:

> It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

Judge Hollander has explained in more detail what conduct § 1692j prohibits:

> Section 1692j was passed "specifically to address an abusive practice known in the credit industry . . . as 'flat-rating.'" *Lynn v. Selene Fin., L.P.*, FL-15-159, 2016 WL 5231832, at *9 (E.D.N.C. Aug. 25, 2016).  "'A flat-rater is one who sells to creditors a set of dunning letters bearing the letterhead of the . . . collection agency and exhorting the debtor to pay the creditor at once.  The creditor sends these letters to his debtors, giving the impression that a third party debt collector is collecting the debt.  In fact, however, the flat-rater is not in the business of debt collection, but merely sells dunning letters.  [15 U.S.C. § 1692j] prohibits the practice of flat-rating because of its inherently deceptive nature.'" *Id.* (quoting *Franceschi*, 22 F.Supp.2d at 256); *see* S. Rep. No. 95-382 (1977) (same).

*Garner v. ClaimAssist, LLC*, No. 16-cv-1260-ELH, 2018 WL 3772166, at *10 (D. Md. Aug. 9, 2018).  Ms. Oyathelemi's allegations are not anything like this.  It is undisputed that Ross was acting pursuant to BGE's request that it collect Ms. Oyathelemi's debt.

Ms. Oyathelemi has not identified facts that generate a genuine dispute of Ross violating § 1692j.

### 2. Section 1692d

Section 1692d prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." The statute also provides a nonexclusive list of prohibited conduct, such as "the use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." § 1692d(2).

Ms. Oyathelemi does not identify specific conduct of Ross which she believes violated § 1692d. She does, however, complain that Ross's agents "harass[ed] and belittle[ed] her on the phone in violation of [§] 1692f." (ECF No. 36, at 23). This appears to be in reference to the complaints she made in her September 23, 2020, email and her October 1, 2020, email to Ross. In those emails she complained that:

> I have spoken to several agents on a 2 way recorded phone call (which I also have) that told me that I had not made a payment on account 68887639150 since February 17, 2016 to July 2018. When I said that was impossible to keep utilities on for two years without payment I was ridiculed, berated, and called a liar.

(ECF No. 36-8) (9/23/2020 Email).  And:

> I have asked you for several months to send an
> accounting for what you said I owed and for
> several months the only thing I got was a
> single sheet that claimed I owed 3,022 to BGE
> but no actual accounting thereof.  Although
> this was frustrating, the most infuriating
> exchange came from a July conversation with
> Mike after I called to get information on this
> account.  I was accused by Mike of never
> paying my bills for the entirety of my
> contract period with BGE.  He basically called
> me a liar and used denigrating terms such as
> 'do you understand' as if I was less
> intelligent or less than a person than
> he.  That accusation and this tone caused me
> extreme emotional distress and it still
> continues to bother me to this day.

(ECF No. 37) (10/1/2020 Email).  Thus, she seems to be asserting a § 1692d claim under the prohibition on using "language the natural consequence of which is to abuse the hearer[.]"  15 U.S.C. § 1692d(2).

"'[C]laims under § 1692d should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse.' *Jeter*[*v. Credit Bureau*]*,* 760 F.2d [1168,] 1179 [(11ᵗʰ Cir. 1985)]."  *Dorsey v. Morgan*, 760 F.Supp. 509, 515 (D.Md. 1991).  "[O]rdinarily the question of whether conduct harasses, oppresses or abuses will be a question for the jury.  However, a claim under 1692d can be decided as a matter of law when the conduct complained of is outside the scope of conduct actionable under the statute."  *Mammen*

*v. Bronson & Migliaccio, LLP*, 715 F.Supp.2d 1210, 1218 (M.D.Fla. 2009) (citing *Jeter*, 760 F.2d at 1178).

Ms. Oyathelemi has generated a genuine dispute about whether Ross violated § 1692d.  Her evidence indicates that Ross employees incorrectly told her that she had never paid a bill on the xx150 Account, and called her a liar when she protested that she had paid the xx150 Account bills.  This, coupled with the allegedly demeaning tone used by Ross employees in their communications with Ms. Oyathelemi, is evidence from which a reasonable jury could conclude that the language would have the natural consequence of abusing a consumer relatively more susceptible to harassment, oppression, or abuse.  *See Wood v. Oxford L., LLC*, Civil Action No. 2:13-6467, 2015 WL 778778, at *6 (S.D.W.Va. Feb. 24, 2015) ("Accusing a consumer of lying about his ability to repay suggests that the consumer is willfully refusing to honor his obligation. It implies, in other words, that the consumer is acting dishonorably—that he is one of the 'miniscule' number of 'deadbeats' who borrow money that they never intend to repay. . . . That is precisely the sort of demeaning insult that, in the debt collection context, is likely to abuse the consumer, particularly one whose circumstances make him 'relatively more susceptible to harassment, oppression, or abuse.'").

35

### 3. Section 1692g[13]

Section 1692g sets requirements for how a debt collector must give notice to a consumer, and what a debt collector must do when a consumer disputes a debt.  Section 1692g(a) requires that:

> [w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing[:]
>
> (1) the amount of the debt;
>
> (2) the name of the creditor to whom the debt is owed;
>
> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>
> (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide

_____

[13] Section 1692g is addressed out of order because subsection (e) relies in part on an understanding of subsection (g), and subsection (f) is the "backstop" provision for the FDCPA.

> the consumer with the name and address of
> the original creditor, if different from
> the current creditor.

Ross sent two letters to Ms. Oyathelemi regarding the BGE debt, the second of which is the one to which she responded. Both letters (1) identify the amount of the debt as $3,022.41; (2) BGE as the creditor; and (3) include the three statements required by §§ 1692g(a)(3), (4), and (5). (ECF Nos. 34-3; 34-4).

Section 1692g(b) requires that:

> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumers right to dispute the debt or request the name and address of the original creditor.

While not clear, Ms. Oyathelemi may be asserting that Ross's failure to provide her with a "ledger" violated § 1692g(b)'s

requirement that a debt collector obtain verification of a debt

from a creditor.  That would be incorrect.[14]

> [V]erification of a debt involves nothing more
> than the debt collector confirming in writing
> that the amount being demanded is what the
> creditor is claiming is owed; the debt
> collector is not required to keep detailed
> files of the alleged debt.  *See Azar v.
> Hayter,* 874    F.Supp.    1314,    1317
> (N.D.Fla.), *aff'd,* 66  F.3d  342  (11th  Cir.
> 1995), *cert. denied,* 516 U.S. 1048, 116 S.Ct.
> 712, 133 L.Ed.2d 666 (1996).  Consistent with
> the legislative history, verification is only
> intended to "eliminate the . . . problem of
> debt collectors dunning the wrong person or
> attempting to collect debts which the consumer
> has already paid."  S.Rep. No. 95-382, at 4
> (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695,
> 1699.  **There is no concomitant obligation to
> forward copies of bills or other detailed
> evidence of the debt.**

*Chaudhry v. Gallerizzo*, 174 F.3d 394, 406 (4th Cir. 1999) (emphasis

added).  It is undisputed that on August 20, 2020, ten days after

its second debt collection letter to Ms. Oyathelemi, and after Ms.

Oyathelemi disputed the BGE debt to Ross, Ross sent a letter to

Ms. Oyathelemi stating that it had verified the debt with BGE and

---

[14] Ms. Oyathelemi also asserts that Ross did not provide copies
of past bills showing "proof of conflicting dates that defendant
certified to the credit bureaus."  It is not clear what she means.
This may be an assertion that she was entitled to receive from
Ross certain bills under § 1692g(b).  As explained, that is
incorrect.  *See Chaudhry*, 174 F.3d at 406.  She also asserts that
she obtained these bills in discovery, but does not seem to have
included them or otherwise cite them in support of this theory.
To the extent that she is once against asserting Ross reported
inaccurate information, she has not generated a genuine dispute on
that issue.

attaching her July 2018 bill showing the amount due. (ECF No. 34-5).  There is no genuine dispute that Ross complied with § 1692g. Summary judgment will be granted on this claim.

**4. Section 1692e**

Section 1692e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

> "The Fourth Circuit has adopted the 'least sophisticated consumer' standard to determine if a Section 1692e violation has occurred," meaning a misrepresentation is actionable so long as it would mislead the "least sophisticated consumer." *Stewart v. Bierman*, 859 F.Supp.2d 754, 761 (D.Md. 2012) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999)).  "[T]he test is the capacity of the statement to mislead; evidence of actual deception is unnecessary." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996).  Misleading statements are actionable when they influence a consumer's decision about "how to respond to the efforts to collect the debt." *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 127 (4th Cir. 2014).

*Long*, 374 F.Supp.3d at 532.

Ms. Oyathelemi expressly invokes §1692e(8), which prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."  Ms. Oyathelemi bases her allegation on her assertion that Ross continues to report the BGE debt without the notation

39

that it is disputed.[15]    (ECF No. 36, at 24).   As evidence, she
points to her discovery response, which describes a May 2021
Experian credit report which fails to state that she is disputing
the BGE debt.   That report does not appear to be a part of the
summary judgment record.   The duty to report a dispute, however,
only triggers upon a dispute in response to a 1692g(a) notice.

> [T]he term "disputed debts" is a term of art
> under the FDCPA that applies when a "consumer
> notifies the debt collector in writing within
> the thirty-day period described in
> [§ 1692g(a)] that the debt, or any portion
> thereof, is disputed, or that the consumer
> requests the name and address of the original
> creditor." 15 U.S.C. § 1692g(b).   The 30-day
> period referenced in the statute commences
> when the debt collector provides the consumer
> with a written notice of the debt.

*Lupo v. JPMorgan Chase Bank, N.A.*, No. 14-cv-0475-DKC, 2016 WL
3459855, at *11 (D.Md. June 24, 2016).   Ms. Oyathelemi would need
to have put evidence into the summary judgment record that Ross,
after receiving her dispute in August 2020, failed to report to
CRAs that she was disputing the BGE debt.   She has introduced no
evidence that Ross failed to do so.   Her evidence is an unprovided
credit report that only shows that half-a-year later a CRA is not

_____

[15] She also asserts that Ross violated § 1692e because it "did
not review [her] records before certifying the debt to Credit
Bureaus, but were relying on the word of BGE and a single bill
showing BGE merged account." (ECF No. 36, at 23-24).   This appears
to be an argument that Ross communicated false information in
violation of subsection (8).   As explained above in the FCRA
context, Ms. Oyathelemi has not generated a dispute about the
accuracy of the BGE debt.

publishing on its report that she disputed the debt.  Her evidence does not show whether the failure to denote a previous dispute was the decision of Experian or Ross.  She has not generated a genuine dispute on the § 1692e(8) claim.

Ms. Oyathelemi also complains that Ross's assertion that she had not paid a bill on the xx150 Account since 2016 violates § 1692e.  That appears to be a reference to § 1692e(10), which prohibits "[t]he use of any false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  Ross's own submissions into the summary judgment record support the conclusion that Ms. Oyathelemi had been making at least some payments on the xx150 Account.  Summary judgment will be denied on the § 1692e(10) claim.

### 5. Section 1692f

> Section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect any debt," 15 U.S.C. § 1692f, and allows courts to sanction conduct that the FDCPA does not directly address.  *Price-Richardson v. DCN Holdings, Inc.*, No. CV MJG-17-2038, 2018 WL 902167 at *8 (D.Md. Feb. 15, 2018).  For example, courts have found "debt collectors that engage in collection activities without a license are in violation" of § 1692f.  *See Hauk v. LVNV Funding, LLC*, 749 F.Supp.2d 358, 366 (D.Md. 2010).  "However, courts have limited § 1692f's prohibitive reach to conduct that is 'separate and distinct' from other alleged FDCPA violations."  2018 WL 902167 at *8 (collecting cases).

*Long*, 374 F.Supp.3d at 533.   None of Ms. Oyathelemi's factual assertions appear to be "separate and distinct" from other alleged FDCPA violations.   Ross is entitled to judgment on this claim.

   **C.   State Law Claims**

   The first time Ms. Oyathelemi asserts Maryland State law claims in a formal filing is in her opposition to summary judgment. Ms. Oyathelemi's counsel should have moved to amend the complaint after taking on her case.  He did not.  Ross asserts that judgment should be entered against these claims because an opposition to summary judgment is an inappropriate place to amend a complaint. While true, Ms. Oyathelemi does not appear to have added any factual claims.   She is simply adding another legal basis under which she brings her claims.   In any event, Ross is entitled to summary judgment against all of these claims on the merits.

   Ms. Oyathelemi vaguely asserts claims under the Maryland Consumer Debt Collection Act ("MCDCA"), the Maryland Consumer Protection Act ("MCPA"), and the Maryland Collection Agency Licensing Act ("MCALA").   Her factual assertions seem to be the same as for her federal law claims.   She asserts generally that Ross incorrectly claims that she owes the BGE debt; the debt total is inaccurate; Ross inaccurately asserted that she had not paid a bill on the xx150 Account since February 2016; Ross failed to provide an accounting; and Ross "failed to properly before certifying."   Failed to properly "what" is unclear—perhaps

42

validate the debt.  Once again, Ms. Oyathelemi fails to identify specific provisions of the statutes.

### 1. Maryland Consumer Debt Collection Act

Ms. Oyathelemi's MCDCA claim appears to be invoking §§ 14-202(7) and (8).  Subsection (7) prohibits a debt collector from "[u]s[ing] obscene or grossly abusive language in communicating with the debtor or a person related to him[.]"  Subsection (8) prohibits a debt collector from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist[.]"

The Maryland Court of Special Appeals has construed § 14-202(7) and held that calling a consumer a "liar" is not "grossly abusive":

> Mullendore's **characterization of Mrs. Dick as a liar may have been both harsh and insulting, and hence, abusive. But the statute calls for language that is "grossly" abusive.**  Whether this requirement must equate with "extreme and outrageous," we need not decide. It requires language that is more than merely abusive,— language that is "flagrantly" (Webster's) or "greatly" (Black's Law Dictionary (Rev. 4th ed.)) abusive.  **As a matter of law, we hold that Mullendore's language, as alleged, was not "grossly abusive."**

*Dick v. Mercantile-Safe Deposit & Tr. Co.*, 63 Md.App. 270, 279 (1985)(emphasis added).  In *Dick*, the defendant went beyond calling plaintiff a liar:

> Mullendore shouted at appellants and spoke in angry tones.  He said he had heard they were

43

getting a divorce. He threatened that if
appellants declared bankruptcy he would attach
their homes and wages. He insisted that
delinquent payments be made in cash, rather
than by check. He demanded that they not
contest a summary judgment proceeding
Mercantile had brought to collect its
indebtedness. At a meeting with Mrs. Dick at
the Frederick Airport, following a third
repossession of the airplane, Mullendore again
threatened to attach her house and salary,
insisted on payment of $441, and thanks to his
arrogance, reduced Mrs. Dick to tears. **After
a fourth repossession, Mullendore called Mrs.
Dick at her office and shouted so loudly that
a third party who was present could hear his
remarks. He interrupted Mrs. Dick throughout
this conversation, accused her of lying, and
said "[y]ou're not as stupid as you act."** When
Mrs. Dick suggested that Mercantile might be
liable for lost rentals on the airplane, he
yelled "[A]re you trying to scare me? I'm not
afraid of something like you." Later,
Mullendore reported to The Credit Bureau,
Inc., that Mrs. Dick had a history of
delinquent credit obligations.

*Dick*, 63 Md.App. at 274-75 (emphasis added). Those facts are

comparable to Ms. Oyathelemi's allegations that she was called a

liar, "berated," and talked to in a tone that suggested that she

was less a person than "Mike." Thus, Ross's agents may have been

rude and perhaps even abusive, but they were not grossly abusive.

Ms. Oyathelemi has not generated a genuine dispute on this issue.

Summary judgment will be entered against this claim.

　　To succeed under § 14-202(8), a plaintiff must satisfy two

elements:

　　　　(1) that Defendant did not possess the right
　　　　to collect the amount of debt sought; and (2)

44

that Defendant attempted to collect the debt
knowing that it lacked the right to do so.
*See Lewis v. McCabe, Weisberg, & Conway, LLC*,
No. DKC-13-1561, 2014 WL 3845833, at *6 (D.Md.
Aug. 4, 2014). "The key to prevailing on a [§
14-202(8) claim] is to demonstrate that the
defendant 'acted with knowledge as to the
invalidity of the debt.'" *Pugh v. Corelogic
Credco, LLC*, No. DKC-13-1602, 2013 WL 5655705,
at *4 (D.Md. Oct. 16, 2013) (emphasis in
original) (quoting *Stewart v. Bierman*, 859
F.Supp.2d 754, 769 (D.Md. 2012)).

*Awah v. CAPITAL ONE BANK, N.A.*, No. 14-cv-1288-DKC, 2016 WL 930975,

at *5 (D.Md. Mar. 11, 2016), *dismissed sub nom. Awah v. Cap. One

Bank*, 668 Fed.Appx. 463 (4th Cir. 2016).

Judge Williams's analysis is instructive:

The MCDCA, and in particular § 14-202, is
meant to proscribe certain methods of debt
collection and is not a mechanism for
attacking the validity of the debt itself.
The Act proscribes certain conduct, (1)
through (9), by a collector in "collecting or
attempting to collect an *alleged* debt . . ."
Md. Code Ann., Com. Law § 14-202 (emphasis
added). In other words, the [MCDCA] focuses
on the conduct of the debt collector in
attempting to collect on the debt, whether or
not the debt itself is valid. Plaintiff
contends that she is entitled to relief under
paragraph (8) of the provision based on
Defendants' knowledge that the underlying debt
did not exist. Paragraph (8) provides that a
collector, in attempting to collect an alleged
debt, may not "[c]laim, attempt, or threaten
to enforce a right with knowledge that the
right does not exist." *Id.* § 14-202(8).
Section [ ] 14-202(8) only makes grammatical
sense if the underlying debt, expressly
defined to include an alleged debt, is assumed
to exist, and the specific prohibitions are
interpreted as proscribing certain methods of
debt collection rather than the debt itself.

45

*Fontell v. Hassett*, 870 F.Supp.2d 395, 405-06 (D.Md. 2012) (emphases in original).

Ms. Oyathelemi has not generated a genuine dispute on this claim either.  Her argument is that Ross incorrectly claimed she owed the BGE debt and that the debt total was inaccurate.  (ECF No. 36, at 25).  As explained above, all she has done is presented evidence that shows that she believes the debt is inaccurate.  She has not generated a genuine dispute about whether the BGE debt is accurate, or whether Ross knew the debt was invalid.  Summary judgment will be entered on this claim as well.

### 2. The Maryland Consumer Protection Act

The MCPA prohibits commercial entities from engaging in any "unfair or deceptive trade practice" in "[t]he collection of consumer debts."  Md. Code Ann., Com. Law § 13-303(5).  To prevail under the MCPA, Plaintiff must establish: "(1) an unfair or deceptive practice or misrepresentation that (2) is relied upon, and (3) causes [him] actual injury."  *Bierman*, 859 F.Supp.2d at 768 (citing *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 143 (2007)).

> A plaintiff must identify a trade "practice" that is unfair, abusive, or deceptive. *Hibdon v. Safeguard Properties, LLC*, No. 14-cv-591-PJM, 2015 WL 4249525, at *7 (D.Md. July 9, 2015); *see also Wheeling v. Selene Financial LP*, 473 Md. 356, 388 (2021) ("Section 13-303 of the MCPA generally prohibits unfair, abusive, or deceptive trade practices, and § 13-301 of the Act contains a nonexclusive list

> of practices that are defined to be unfair,
> abusive, or deceptive.").

*Peters v. Best Buy Stores, L.P.*, No. 20-cv-2007-DKC, 2022 WL 622304, at *6 (D.Md. Mar. 3, 2022).

> The injury must be "an identifiable loss,
> measured by the amount the consumer spent or
> lost as a result of his or her reliance on the
> [ ] misrepresentation." Green v. Wells Fargo
> Bank, N.A., 927 F.Supp.2d 244, 255 (D.Md.
> 2013), *aff'd*, 582 Fed.Appx. 246 (4th Cir. 2014)
> (alteration in original) (quoting Lloyd v.
> Gen. Motors Corp., 397 Md. 108, 143 (2007)).

*Id.*

Ms. Oyathelemi has not identified a deceptive practice. At most, she has identified a misrepresentation—asserting that she had not paid bills on the xx150 Account. She has not, however, generated evidence that she relied upon that misrepresentation or that it caused her injury. She has generated evidence of the exact opposite—she rejected the misrepresentation and has been damaged by the effort to collect the BGE debt, not the errant statement about her payment history. Summary judgment will be entered on this claim.

### C. Maryland Collection Agency Licensing Act

MCALA prohibits "knowingly or willfully do[ing] business as a collection agency in the State unless the person has a license." Md. Code. Ann. Bus. Reg. § 7-401(a). *See also LVNV Funding LLC v. Finch*, 463 Md. 586, 595, 611-12 (2019) (holding private right of action exists when violation of MCALA is brought as a violation of

the MCDCA).  Ms. Oyathelemi does not identify what actions of Ross violated MCALA.  She only cites to the definitions provision of the statute, § 7-101.  She has not even argued that Ross was or is an unlicensed debt collector.  Invocation of this provision appears to have been an attempt by Ms. Oyathelemi's counsel to throw multiple theories at the wall and see what sticks.  Summary judgment will be entered on this claim.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.  As noted above, the pro se district court complaint does not articulate Plaintiff's claims clearly and in conformity with the federal rules.  Before this case proceeds to trial, Plaintiff will be required to file an amended complaint that delineates the surviving claims under the FDCPA (pursuant to §§ 1692d and 1692e(10)), and Defendant will file an answer.  The court will then convene a telephone conference to set a trial date.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
